Estado Libre Asociado de Puerto Rico
TRIBUNAL DE APELACIONES
PANEL ESPECIAL

| NANCY ELIS MARTÍNEZ<br><br>Parte Apelada<br><br>v.<br><br>JAY D. DÁVILA<br><br>Parte Apelante | TA2025AP00170 | *Apelación* procedente del Tribunal de Primera Instancia, Sala Superior de Humacao<br><br>Sobre:<br>Custodia<br><br>Caso núm.:<br>HU2021RF00710 |
| --- | --- | --- |

Panel integrado por su presidente, el Juez Hernández Sánchez, el Juez Marrero Guerrero y el Juez Robles Adorno[1]

Robles Adorno, Juez Ponente.

### SENTENCIA

En San Juan, Puerto Rico, a 17 de marzo de 2026.

El 25 de julio de 2025, el señor Jay D. Dávila (el señor Dávila o el apelante) presentó ante nos un recurso de apelación en el que nos solicita que revoquemos la *Resolución*[2] emitida y notificada el 28 de abril de 2025, por el Tribunal de Primera Instancia, Sala Superior de Humacao (TPI o foro primario). En el aludido dictamen, el TPI concedió la custodia exclusiva del menor JMD a su madre, la señora Nancy Elis Martínez (en adelante, señora Martínez o apelada).

### I.

El caso de epígrafe tiene su inicio el 17 de diciembre de 2021, cuando la señora Martínez presentó una *Urgente Petición de Custodia*[3] contra el señor Dávila en la que solicitó al tribunal que concediera la custodia compartida del menor JMD. La parte apelada sostuvo que estando casada con el señor Dávila procrearon al menor de edad JMD, quien a la fecha de la presentación de la solicitud tenía dos (2) años. Indicó que, en septiembre de 2021, ante un

---

[1] Véase OATA-2025-170 del 3 de septiembre de 2025 en la que se designa al Juez Robles Adorno en sustitución del Juez Rivera Torres.
[2] Entrada Núm. 224 del caso Núm. HU2021RF00710 en el Sistema Unificado de Manejo y Administración de Casos (SUMAC) del TPI.
[3] Entrada Núm. 1 del caso Núm. HU2021RF00710 en el SUMAC del TPI.

alegado patrón de violencia doméstica que vivía con el señor Dávila, tuvo que mudarse con su hijo del Estado de Delaware a Puerto Rico. Añadió que, temiendo por su seguridad y la de su hijo, había solicitado una orden de protección contra el apelante, la cual estaba pendiente de ser diligenciada. Por ello, solicitó al tribunal que refiriera el asunto a la Unidad de Trabajo Social para que realizaran un Informe Social con el fin de concederle la custodia compartida a su favor.

Posteriormente, por orden del tribunal para que aclarase si la petición era de custodia o custodia compartida[4], la parte apelada presentó una *Enmienda a Urgente Petición de Custodia*[5], en la que solicitó que, en lugar de que la custodia fuera compartida, el tribunal le concediera la custodia [exclusiva] del menor JMD.

El 28 de marzo de 2022, ante la incomparecencia inicial del señor Dávila, el TPI dictó una *Sentencia*[6] en rebeldía en la que le concedió la custodia del menor JMD a su madre, la señora Martínez. El 28 de abril de 2022, el TPI emitió una *Sentencia Nunc Pro Tunc*, cuya enmienda consistió en corregir el nombre del menor. [7]

El 18 de mayo de 2022, el señor Dávila compareció por medio de su representación legal y solicitó acceso al expediente.[8] Al día siguiente, el apelante presentó ante el TPI una *Moción solicitando relevo de sentencia*[9], en la que, entre otras cosas, solicitó al tribunal que dejara sin efecto la sentencia de custodia. El 9 de junio de 2022, la parte apelada se opuso a que el tribunal dejara sin efecto la sentencia dictada en rebeldía[10] y el foro primario emitió una orden en la que determinó que el asunto sería atendido en la vista señalada para el 13 de junio de 2022.[11]

---

[4] Entrada Núm. 3 del caso Núm. HU2021RF00710 en el SUMAC del TPI.
[5] Entrada Núm. 4 del caso Núm. HU2021RF00710 en el SUMAC del TPI.
[6] Entrada Núm. 17 del caso Núm. HU2021RF00710 en el SUMAC del TPI.
[7] Entrada Núm. 27 del caso Núm. HU2021RF00710 en el SUMAC del TPI.
[8] Entradas Núm. 30 y 31 del caso Núm. HU2021RF00710 en el SUMAC del TPI.
[9] Entrada Núm. 36 del caso Núm. HU2021RF00710 en el SUMAC del TPI.
[10] Entrada Núm. 44 del caso Núm. HU2021RF00710 en el SUMAC del TPI.
[11] Entrada Núm. 49 del caso Núm. HU2021RF00710 en el SUMAC del TPI.

Celebrada la vista para discutir las mociones sobre el relevo de sentencia contra el señor Dávila, el TPI declaró No Ha Lugar la solicitud presentada por el apelante y prohibió a los padres sacar al menor fuera de la jurisdicción de Puerto Rico sin previa autorización del Tribunal.[12]

El 2 de junio de 2022, la parte apelante presentó una *Urgente Moción para que se le ordene a la demandante que informe el paradero del menor*[13], en la que alegó que la señora Martínez se había comunicado con él para notificarle que la hija mayor de esta, la señora Ashley Mora Martínez (señora Mora Martínez), había presentado un caso en su contra y que, como resultado, el tribunal le había removido la custodia del menor JMD. Por ello, solicitó al TPI que interviniese y ordenara a la parte apelada que notificara con quien estaba el menor y si en efecto había una querella o un caso en su contra.

Con relación a lo anterior, surge del expediente que, el 13 de junio de 2022, el Departamento de la Familia presentó un *Informe de Investigación de protección*[14] del cual se desprende que la señora Mora Martínez, hija mayor de la parte apelada, presentó una orden de protección contra su madre y en beneficio de sus dos hermanos, el menor JMD y otra hija menor de edad de la señora Martínez, producto de una relación previa. En su petición, la señora Mora Martínez alegó que la parte apelada maltrataba física y emocionalmente a los menores y que incurría en actos de negligencia. Ante esas alegaciones y tras una investigación realizada por el Departamento de la Familia se expidió la orden de protección en contra de la señora Martínez y, para garantizar la seguridad de

---

[12] Véase Minuta en la Entrada Núm. 50 del caso Núm. HU2021RF00710 en el SUMAC del TPI.

[13] Entrada Núm. 39 del caso Núm. HU2021RF00710 en el SUMAC del TPI.

[14] Entrada Núm. 46 del caso Núm. HU2021RF00710 en el SUMAC del TPI. Véase, además, expediente del caso Núm. CGL2462022-00522 en la Entrada Núm. 47 en el SUMAC del TPI.

los menores, se concedió la custodia provisional del menor JMD al señor Luciano del Valle, tío materno, y a la señora María Reyes, abuela materna. En consecuencia, la custodia del menor JMD fue ejercida provisionalmente por familiares maternos, no encontrándose el menor bajo la custodia directa de ninguno de sus padres.

Así las cosas, el 6 de julio de 2022, el señor Dávila presentó una *Moción Informando Denegación de Orden de Protección; Solicitando que se re[e]stablezcan las relaciones paterno[f]iliales con el menor*[15] y una *Moción Urgente Solicitando Custodia y Patria Potestad.*[16] En su primer escrito, el apelante notificó al tribunal que se había denegado la orden de protección solicitada por la señora Martínez en su contra por el Tribunal entender que no se configuraban los elementos para expedirla y solicitó al TPI que fijara las relaciones paternofiliales con el menor ya que este último se encontraba bajo la custodia provisional de la abuela materna y del tío materno. En su segunda moción, el señor Dávila solicitó al tribunal que le fuera adjudicada la custodia exclusiva del menor JMD.

A esos efectos, el 7 de julio de 2022, el TPI emitió una *Orden* en la que refirió la investigación a la Oficina de Relaciones de Familia del Tribunal.[17] Asimismo, el foro primario le concedió un término a la parte apelante para que notificara el perito que estaría contratando para realizar el estudio social interagencial.[18] El señor Dávila cumplió con lo ordenado[19] y el TPI autorizó a que se realizara el estudio.[20]

---

[15] Entrada Núm. 51 del caso Núm. HU2021RF00710 en el SUMAC del TPI.
[16] Entrada Núm. 52 del caso Núm. HU2021RF00710 en el SUMAC del TPI.
[17] Entrada Núm. 54 del caso Núm. HU2021RF00710 en el SUMAC del TPI.
[18] Entrada Núm.55 del caso Núm. HU2021RF00710 en el SUMAC del TPI.
[19] Entradas Núm. 58, 60 y 62 del caso Núm. HU2021RF00710 en el SUMAC del TPI.
[20] Entrada Núm. 64 del caso Núm. HU2021RF00710 en el SUMAC del TPI.

Tras varios incidentes procesales el señor Dávila presentó el *Estudio Social Pericial*[21] que preparó su perito, el señor Luis A. Zamot Ortiz (TS Zamot).

Por su parte, el 22 de mayo de 2023, la Trabajadora Social del Programa de Menores y Familia del Tribunal que estuvo a cargo de la investigación del caso, la señora Saribel Herrero Lugo (TS Herrero), presentó su *Informe Social Forense*[22] cuya recomendación fue que la custodia del menor JMD le fuera otorgada a su padre, el señor Dávila, y que este se trasladara a Filadelfia, Pensilvania, donde reside el padre.

El 7 de junio de 2023, la parte apelada notificó al TPI que estaría impugnando el *Informe Social Forense* por varios fundamentos y presentó la información del perito que estaría utilizando a esos fines, el señor Luis M. Rivera Santiago (TS Rivera).[23]

El 8 de junio de 2023, el foro primario autorizó el acceso al perito de la parte apelada al expediente y al *Informe Social Forense* y ordenó a la parte que presentara su informe dentro de los treinta (30) días siguientes a la fecha de notificación de la orden.[24]

En esa misma fecha, la parte apelante presentó una moción indicando que estaba de acuerdo con el *Informe Social Forense* y solicitó al TPI que le concediera la custodia provisional del menor en lo que se atendía la impugnación del informe ya que del mismo surgían hechos que, según el señor Dávila, confirmaban que el menor había sido objeto de maltrato mientras estaba en custodia de

---

[21] Anejo de la Entrada Núm. 90 del caso Núm. HU2021RF00710 en el SUMAC del TPI.

[22] Anejo de la Entrada Núm. 100 del caso Núm. HU2021RF00710 en el SUMAC del TPI.

[23] Entrada Núm. 102 del caso Núm. HU2021RF00710 en el SUMAC del TPI.

[24] Entrada Núm. 103 del caso Núm. HU2021RF00710 en el SUMAC del TPI.

su madre.[25] La señora Martínez se opuso[26] y el TPI determinó celebrar una vista para atender las mociones de ambas partes.[27]

Celebrada la vista el 11 de julio de 2023, el foro primario no emitió ninguna determinación respecto a la custodia del menor, manteniéndose inalterado el estatus existente mientras continuaban los trámites relacionados a los informes periciales.[28]

El 17 de julio de 2023, la parte apelada presentó una *Moción en Cumplimiento de Orden Informe Pericial[29]*, en la cual incluyó como anejo la *Evaluación y Análisis Pericial al Informe Social Forense sobre los asuntos de Custodia, Relaciones Filiales y Relocalización* que preparó su perito, el TS Rivera.

El 19 de julio de 2023, el TPI emitió una *Resolución[30]* con relación a la vista celebrada el 11 de julio, en la que estableció las relaciones paternofiliales, reiteró a ambos padres la prohibición de sacar al menor de la jurisdicción de Puerto Rico sin la autorización del Tribunal y prohibió que el menor JMD tuviera relaciones filiales con su tío materno, el señor Luciano del Valle.

El 15 de agosto de 2023, el señor Dávila presentó ante el TPI una *Urgente Moción Solicitando que se ordene la Custodia Provisional al Padre y Solicitud de Desacato a Orden de Alejamiento del Tío Materno con el Menor.*[31] En su escrito, la parte apelante alegó que el menor estaba teniendo comportamientos que denotaban en que podía haber sido abusado sexualmente, expuesto a conducta obscena, así como que había sido maltratado física y emocionalmente. Asimismo, solicitó que se encontrara incurso en desacato a la señora Martínez toda vez que esta había incumplido

---

[25] Entrada Núm. 104 del caso Núm. HU2021RF00710 en el SUMAC del TPI.
[26] Entrada Núm. 106 del caso Núm. HU2021RF00710 en el SUMAC del TPI.
[27] Entradas Núm. 109 y 110 del caso Núm. HU2021RF00710 en el SUMAC del TPI.
[28] Véase Minuta en la Entrada Núm. 118 del caso Núm. HU2021RF00710 en el SUMAC del TPI.
[29] Entrada Núm. 119 del caso Núm. HU2021RF00710 en el SUMAC del TPI.
[30] Entrada Núm. 121 del caso Núm. HU2021RF00710 en el SUMAC del TPI.
[31] Entrada Núm. 126 del caso Núm. HU2021RF00710 en el SUMAC del TPI.

con la orden del tribunal que prohibía que el menor se relacionara con su tío materno.

En esa misma fecha, la parte apelada también presentó una *Urgente Moción Solicitando Intervenció[n] del Tribunal Superior en asunto radicado en Tribunal Municipal.*[32] Alegó que el señor Dávila había presentado ante una Sala Municipal del Tribunal de Humacao una orden de protección al amparo de la Ley Núm. 57 de 11 de mayo de 2023, según enmendada, conocida como Ley para Prevención del Maltrato, Preservación de la Unidad Familiar y para la Seguridad, Bienestar y Protección de los Menores, 8 LPRA secs. 1641 *et seq.*, con la intención de que le quitaran la custodia a la madre, basándose en alegaciones falsas, exageradas e infundadas. Además, negó las alegaciones del señor Dávila en cuanto a haber incumplido con la orden del tribunal, ya que esta aseguró que el menor no había tenido ningún contacto con su tío.

Así las cosas, el TPI emitió una *Orden*[33] refiriendo la situación a la atención urgente de la Unidad de Trabajo Social para que investigaran las alegaciones de las partes.

Tras varios incidentes procesales, el Departamento de la Familia compareció mediante una *Moción Informativa sobre Informe Social.*[34] Presentaron una *Carta Informativa por Orden de Protección* de la cual surge que, luego de una investigación preliminar sobre las alegaciones por conducta sexualizada o abuso, el Departamento de la Familia había referido el caso al Programa CIMVAS para que ellos pudieran culminar el proceso de investigación y que, al no identificarse situación de peligro en esa etapa de la investigación, recomendaban que el menor permaneciera con su madre.

---

[32] Entrada Núm. 127 del caso Núm. HU2021RF00710 en el SUMAC del TPI.
[33] Entradas Núm. 128 y 129 del caso Núm. HU2021RF00710 en el SUMAC del TPI.
[34] Entrada Núm. 143 del caso Núm. HU2021RF00710 en el SUMAC del TPI.

El 5 de octubre de 2023, el TPI notificó una *Orden*[35] en la que dejó sin efecto el proceso de impugnación del *Informe Social Forense* que estaba pendiente y ordenó a la Unidad de Trabajo Social que actualizara la investigación y realizara un informe complementario que atendiera las alegaciones del señor Dávila sobre abuso sexual y las de la señora Martínez sobre alienación parental.[36]

El 6 de mayo de 2024, el Programa CIMVAS, adscrito al Departamento de Salud, radicó un *Informe Pericial de Evaluaciones de Abuso Sexual*[37] emitido el 25 de abril de 2024, relacionado con el menor JMD, preparado por la Dra. Limarie Díaz Rodríguez, a solicitud del Departamento de la Familia. Dicho informe consignó que, tras la evaluación forense realizada al menor, no se validaron las alegaciones de abuso sexual referidas y recomendó, entre otras cosas, que se evaluara la posibilidad de que se tratara de un caso de enajenación parental.

Posteriormente, como parte de la actualización ordenada a la Unidad de Trabajo Social del Tribunal, la TS Herrero presentó un *Informe Social Complementario*[38], con fecha de junio de 2024, preparado en cumplimiento de la *Orden* del foro primario para atender específicamente las alegaciones de abuso sexual formuladas por el señor Dávila y las alegaciones de alienación parental levantadas por la señora Martínez. En dicho informe se reseñaron las entrevistas realizadas a los padres y al menor, las observaciones de la dinámica familiar, la coordinación interagencial con el Departamento de la Familia y el Programa CIMVAS, así como las evaluaciones psicológicas y psiquiátricas ordenadas por el Tribunal.

---

[35] Entrada Núm. 149 del caso Núm. HU2021RF00710 en el SUMAC del TPI.

[36] Las alegaciones sobre una posible conducta de enajenación parental fueron presentadas por la parte apelada en una *Moción Informativa sobre impugnación pendiente y otros*. Véase Entrada Núm. 146 del caso Núm. HU2021RF00710 en el SUMAC del TPI.

[37] Entrada Núm. 181 del caso Núm. HU2021RF00710 en el SUMAC del TPI.

[38] Entrada Núm. 186 del caso Núm. HU2021RF00710 en el SUMAC del TPI.

Como parte de los documentos evaluados por la TS Herrero durante dicho proceso, consta además un *Informe de Evaluación Psiquiátrica*[39], preparado por el Dr. Serafín Orengo Vega, psiquiatra adscrito a la Clínica de Diagnóstico del Poder Judicial, fechado el 2 de abril de 2024, en el cual se consignó que inicialmente se había recomendado la custodia al padre por alegada negligencia de la madre y que no se identificaron indicadores de alienación parental por parte del padre.

La recomendación final del *Informe Social Complementario* sostuvo lo recomendado en el primer *Informe Social Forense* respecto a que la custodia le fuera concedida al padre del menor, el señor Dávila, así como su traslado al Estado de Pensilvania.

Luego de notificado el *Informe Social Complementario*, el 23 de julio de 2024, la señora Martínez presentó una *Moción [en] Cumplimiento de Orden*[40], en la cual informó su intención de impugnar dicho informe complementario. El TPI emitió una *Orden*[41] en la que aceptó nuevamente al TS Rivera como perito de la parte apelada y solicitó que presentaran el informe de impugnación en o antes del 10 de septiembre de 2024.

El 12 de septiembre de 2024, la señora Martínez presentó una *Moción de Réplica y en Cumplimiento de Orden*[42], en la cual informó que, con relación al *Informe Social Complementario*, no estaría utilizando perito, sino que impugnaría dicho informe mediante el contrainterrogatorio de la trabajadora social del Tribunal, los psicólogos y el psiquiatra del Tribunal, así como de la trabajadora social del Departamento de la Familia. Además, solicitó que se citara como testigo al perito del señor Dávila.

---

[39] Entrada Núm. 190 del caso Núm. HU2021RF00710 en el SUMAC del TPI.
[40] Entrada Núm. 194 del caso Núm. HU2021RF00710 en el SUMAC del TPI.
[41] Entrada Núm. 195 del caso Núm. HU2021RF00710 en el SUMAC del TPI.
[42] Entrada Núm. 199 del caso Núm. HU2021RF00710 en el SUMAC del TPI.

Las vistas de impugnación se llevaron a cabo los días 6 y 9 de diciembre de 2024, 23 y 24 de enero de 2025 y 14 de marzo de 2025.[43] Durante estas testificaron: la Trabajadora Social del Tribunal, TS Herrero; la Dra. Wanda Luciano Ortega, psicóloga que evaluó a las partes y al menor en 2024, cuyas evaluaciones fueron recogidas en el *Informe Social Complementario* preparado por la TS Herrero; la Trabajadora Social del Departamento de la Familia, Gilmarie Collazo (TS Collazo); el perito de la parte apelada, el TS Rivera; y el perito de la parte apelante, el TS Zamot. Se admitieron en evidencia, entre otros, los informes preparados por el TS Zamot[44] y el TS Rivera.[45]

Luego de escuchar la prueba testifical y evaluar la prueba documental presentada en las vistas de impugnación, el TPI notificó una *Resolución*[46] el 28 de abril de 2025, en la que concedió la custodia del menor JMD a su madre, la señora Martínez. Asimismo, estableció que la patria potestad sería compartida y estableció un plan de relaciones paternofiliales. En su dictamen, el foro primario no elaboró determinaciones de hechos ni realizó conclusiones de derecho, limitándose a adjudicar la custodia y a establecer las relaciones paternofiliales, sin exponer los hechos probados ni el derecho aplicable que sustentaran su determinación.

Inconforme, el 13 de mayo de 2025, la parte apelante presentó ante el TPI una *Moción Solicitando Reconsideración a Resolución y Solicitud de Determinaciones de Hechos Adicionales*.[47] Sostuvo que la *Resolución* del TPI no contenía determinaciones de hecho ni conclusiones de derecho que fundamentaran la decisión del foro primario, en contravención a la Regla 42.2 de Procedimiento Civil,

---

[43] Véanse Minutas en las Entradas Núm. 216, 217, 218, 219 y 223 del caso Núm. HU2021RF00710 en el SUMAC del TPI.

[44] Véase Minuta en la Entrada Núm. 223 del caso Núm. HU2021RF00710 en el SUMAC del TPI.

[45] Véase Minuta en la Entrada Núm. 218 del caso Núm. HU2021RF00710 en el SUMAC del TPI.

[46] Entrada Núm. 224 del caso Núm. HU2021RF00710 en el SUMAC del TPI.

[47] Entrada Núm. 235 del caso Núm. HU2021RF00710 en el SUMAC del TPI.

32 LPRA Ap. V, R. 42.2. Asimismo, argumentó que el foro primario no tomó en consideración los criterios establecidos en la Ley Núm. 223 de 21 de noviembre de 2011, según enmendada, conocida como Ley Protectora de los Derechos de los Menores en el Proceso de Adjudicación de Custodia, 32 LPRA sec. 3181 *et seq.,* para la adjudicación de custodia y el mejor bienestar del menor.

La parte apelada presentó su *Moción en Oposición a Reconsideración*[48] mediante la cual alegó que la adjudicación de custodia a su favor fue el resultado de una evaluación exhaustiva del expediente judicial y que el TPI actuó correctamente al así proceder.

El 26 de junio de 2025, el foro primario emitió su determinación declarando No Ha Lugar a la moción de reconsideración presentada por el señor Dávila.[49]

En la misma fecha, el TPI notificó una *Resolución*[50] en la que hizo constar las siguientes determinaciones de hechos y tracto procesal del caso:

> 1. Las partes estuvieron casados del 20 de noviembre de 2015 hasta el 26 de octubre de 2023. Véase el caso HU2023RF00108.
>
> 2. Durante la relación procrearon un hijo, [JMD], quien nació el 27 de junio de 2019 en Pennsylvania.
>
> 3. Al momento de casarse la demandante tenía otros tres hijos, dos que ya eran adultos y una tercera hija menor de edad que vivía con ella. Sus dos hijos mayores fueron criados por los abuelos paternos a raíz de varios incidentes de violencia doméstica que la demandante sufrió con el padre de sus primeros tres hijos, y a que ella se unió al servicio activo en las fuerzas armadas.
>
> 4. La demandante fue dada de baja del ejército con 90% de discapacidad por condiciones de artritis, migraña y e [sic] la espalda baja. Recibió tratamiento psiquiátrico hasta el 2014 por trastorno de estrés (PTSD, por sus siglas en inglés) relacionado a las secuelas de violencia doméstica en la relación que sostuvo con el padre de sus tres hijos mayores. En la actualidad no tiene ningún diagnóstico de salud mental.

---

[48] Entrada Núm. 237 del caso Núm. HU2021RF00710 en el SUMAC del TPI.
[49] Entrada Núm. 241 del caso Núm. HU2021RF00710 en el SUMAC del TPI.
[50] Entrada Núm. 242 del caso Núm. HU2021RF00710 en el SUMAC del TPI.

5. El menor, [JMD], residió desde su nacimiento, hasta septiembre de 2021 junto a ambos progenitores, primero en Pennsylvania y después en Delaware, en una residencia que había adquirido la demandante.

6. En Pennsylvania y Delaware la demandante trabajaba como cuidadora de su ex madrastra, la señora Elaine Giraldi, por lo que recibía un pago de unos $3,000.00 mensuales, además recibía los beneficios de pensión como veterana de las fuerzas armadas, los beneficios del seguro social de su otra hija menor de edad y el producto del alquiler de una propiedad que tenía en Pennsylvania. Mientras vivían en Pennsylvania el demandado trabajaba para el Departamento de Servicios Humanos de la Ciudad de Philadelphia. En el informe interestatal no surge cuál era su posición, pero este alegó que había recibido adiestramientos de prevención maltrato menores, salud mental y trauma. No surge evidencia de dichos adiestramientos. De acuerdo al informe social surge que trabajaba como chófer en esa agencia gubernamental.

7. La señora Giraldi se mudó a vivir con las partes.

8. El demandado quedó desempleado en el año 2020 y estaba desempleado al momento de la familia mudarse a Delaware. Durante la relación ambas partes confirmaron que tuvieron varias separaciones y múltiples discusiones, ambos coinciden en que casi todas las diferencias eran causadas por asuntos económicos. De acuerdo al demandado las mismas eran por lo que entendía era un mal manejo de la demandante del dinero de la señora Giraldi, de acuerdo a la demandante las diferencias eran porque el demandado no aportaba económicamente nada a los gastos del hogar.

9. A inicios de septiembre de 2021 la demandante planteó al demandado que se divorciaran. De acuerdo a la demandante él reaccionó de manera alterada y la amenazó con hacerle daño. De acuerdo al demandado él estuvo de acuerdo con divorciarse y le pidió tiempo para mudarse a la casa de su madre a lo que ella accedió. Dos días después el demandado le indicó a la demandante que llevaría su auto a inspeccionar a Pennsylvania y aprovecharía esta gestión para visitar a su madre. El demandado decidió irse a hacer esas gestiones junto al menor [JMD] y con la señora Giraldi. La señora Martínez no estuvo de acuerdo con eso y sostuvieron otra discusión. El señor Dávila continuó con el viaje planificado por él. De acuerdo al demandado, al llevarse a la señora Giraldi de vuelta a Pennsylvania esta decidió instar denuncia contra la demandante por haberse apropiado de un dinero de ella. No se presentó evidencia de esa denuncia. La señora Giraldi también procedió a desautorizar a la demandante a seguir manejando su cuenta bancaria, autorizando entonces al demandado a manejar sus cuentas bancarias. El demandado le comunicó por vía telefónica a la demandada esto, además le indicó que la señora Giraldi no regresaría a Delaware y que la había despedido. La demandante llegó entonces a

Pennsylvania a casa de la madre del demandado y procedió a recoger al menor [JMD]. El demandado acepta que la demandante le informó que había recogido al niño y que antes de marcharse del estado hablaron personalmente al respecto.

10. La demandante regresó a Delaware y el 14 de septiembre de 2021 relocalizó su residencia de Delaware a Puerto Rico. Se mudó junto al menor y su otra hija menor de edad a la residencia de su hija mayor, Ashley Mora Martínez. La demandante no informó al demandado de este viaje a Puerto Rico del menor.

11. La demandante radicó al otro día de llegar a Puerto Rico, el 15 de septiembre de 2021, una petición de orden de protección de Ley 54 de Prevención de Violencia Doméstica, OPA2021-016924, contra el demandado. La Orden de Protección Ex parte fue concedida, se suspendieron las relaciones paternofiliales y se concedió la custodia provisional del menor a la madre. Tras varias suspensiones pues no se había conseguido citar al peticionado, el 29 de junio de 2022 se celebró vista y no se concedió la orden de protección.

12. El demandado alega que fue con la policía al domicilio conyugal en Delaware el 20 de septiembre de 2021 y no encontró a nadie en la casa. No se presentó evidencia de esa querella.

13. El demandado se fue a residir en la casa de la señora Giraldi en Pennsylvania, específicamente en 5632 Miriam Road, Philadelphia, Pennsylvania. El informe interestatal identifica la residencia ubicada en la misma dirección como propiedad del demandado, no surge si se mostró el título de propiedad sobre esta vivienda. En el informe social se indica que alegadamente la señora Giraldi le había cedido su casa al demandado, no surge evidencia al respecto.

14. El demandado trabaja desde su mudanza a Pennsylvania en Patriots Homecare, en el mismo empleo que tenía la demandante como cuidadora de la señora Giraldi.

15. Ambas partes se acusan mutuamente de que han explotado financieramente a la señora Giraldi.

16. La demandante radicó la presente acción el 17 de diciembre de 2021, se emplazó por edicto al demandado, remitiendo copia de la demanda a la siguiente dirección: 837 E. Willard St. Philadelphia P.A. 19134. Del expediente surge que esta era la última dirección de las partes cuando vivieron en Pennsylvania. La demandante posteriormente radicó demanda de divorcio, en el caso HU2022RF00129, la misma fue desistida.

17. Se dictó sentencia enmendada en rebeldía concediendo la custodia del menor a la demandante el 28 de abril de 2022[.]

18. El demandado compareció por primera vez en esta causa el 18 de mayo de 2022. El demandado alega que tomó conocimiento del paradero de su hijo a raíz de una llamada que le había hecho la demandante. Alegó que ella le informó de una orden de protección de menores que le habían radicado en su contra.

19. Surge que el 19 de abril de 2022 la hija mayor de la demandante, Ashley Mora Martínez, había radicado contra la demandante una petición de orden de protección de menores en el caso CGL246-202200522 esto a raíz de una información que alegadamente le había dado su hermana, la menor [AM]. La demandante a su vez en la misma fecha presentó una orden de protección contra su hija Ashley Mora Martínez, en la que alegaba su hija estaba influenciando a su hermana AM, que le quitaba autoridad y se la llevaba de su casa sin su autorización, relató además que AM le había indicado del plan de Ashley Mora Martínez para que le quitaran a sus hijos solicitando una orden de protección. El Departamento de la Familia intervino y encontró el caso con fundamentos en cuanto al menor JMD, pero no en cuanto a AM y se recomendó dar un plan de servicios a la demandante En las determinaciones de hechos del caso CGL246-202200522 se determinó entre otras cosas que: "... la Sra. Nancy Martínez no recibe tratamiento de salud mental desde el año 2014. El Departamento de la Familia programó evaluación psicológica para el 26 de mayo de 2022. La peticionada no ha manejado de manera adecuada al menor de 2 años, los métodos de disciplina utilizados han sido inadecuados, ha actuado sin control. Ha tomado al menor de 2 años por el cuello, le ha pegado dejándole marcas, le ha proferido palabras soeces. La menor de 13 años ha tenido que tomar control del menor de 2 años, en lo que la peticionada se tranquiliza..." Se determinó conceder la orden de protección hasta el 17 de enero de 2023, que el menor, JMD quedara bajo la custodia provisional de un hermano de la demandante, Luciano del Valle y de la abuela materna, María Reyes con relaciones materno filiales abiertas por acuerdo con los recursos y bajo la supervisión de estos[.]

20. Del informe radicado por el Departamento de la Familia (Entrada 46 de SUMAC) surge que las únicas personas que relataron alegados incidentes de maltrato contra JMD son las hijas de la demandante. Ashley M. Mora Martínez alegó que "...ella (la señora Martínez) lo agredía fuertemente con las manos y en ocasiones con correa. Señaló que le dejaba marcas al menor pero no tenía fotos que evidenciaran lo sucedido. No obstante, el menor presentaba una marca reciente en su cara de la cual mostró en foto a suscribiente... Menciono que su mamá había cogido a su hermano por el cuello en una ocasión por lo cual ella tuvo que intervenir en la situación. Explicó que su mamá le hizo eso a su hermano porque este no paraba de llorar." En el mismo informe la menor AM relata que "...el papá de su hermano los maltrataba, identificándolo como Jay Dávila. Mencionó que por eso su mamá tenía una orden de protección. Indicó que este no los agredía

físicamente, pero si les peleaba por todo y restringía las salidas de su mamá de la casa. Señaló que les prohibía a ella y su mamá utilizar cierto tipo de vestimenta. El agarraba fuertemente a su hermano y lo obligaba a que comiera a la fuerza y sino lo hacía lo agredía físicamente, "dándole duro con las manos por todas partes del cuerpo". Expresó que su mamá le expresó a su padrastro que se separaría de él y este se llevó a su hermano de la casa. Señaló que su mamá fue a buscar a su hermano…" En cuanto a su madre, la menor indicó que "…su mama le daba muy duro y con coraje a su hermano en las manos y muslos. En ocasiones le dejaba marcas rojas las cuales se le iban como a los quince minutos. Expresó que su mamá agredía a su hermano porque este lloraba mucho. Mencionó que esta cuando le pegaba le hablaba malo a su hermano diciéndole palabras como hijo de la gran puta. Narró que en una ocasión se levantó al escuchar a su hermano llorar encontrando a su mamá que le estaba pegando y hablando soez, siendo esto cerca de las 11:00 pm. Indicó que a esa hora tuvo que salir del hogar para tranquilizar a su hermano y para que su mamá también se tranquilizara. Destacó que esa no fue la única ocasión en que tuvo que irse fuera de la residencia para tranquilizar a su hermano, ocurrían incidentes más de cinco veces en una semana. Mencionó que hubo otra ocasión en que ella agarró por el cuello a su hermano interviniendo su hermana Ashley ante la situación. Indicó que su mamá expresó que había agarrado a su hermano por el cuello para estrangularlo y que esta lo expreso: "como si nada y sonriendo". Expresó esta conducta con su hermano su mamá comenzó a tenerla cuando se vinieron para Puerto Rico. Indicó que con ella no se utilizaba el castigo físico ni verbal. No obstante, su mamá la acusa de que ella le cuenta todo a su hermana." No surge de entrevistas al pediatra, colaterales, maestras del cuido de JMD y de la escuela de AM, ni de otros familiares entrevistados en ese momento que se haya observado ningún incidente de abuso, maltrato o negligencia contra los menores. De acuerdo a dicho informe la pediatra indicó que "En relación con la marca que el menor [JMD] presentaba en la cara esta indicó que no podía precisar si eran producto de maltrato f[í]sico o que el menor se dio el golpe de otra manera. Expresó que el golpe era de hace días, pero no pudo precisar tiempo en específico." De acuerdo a la entrevista realizada en el cuido de [JMD], Manitas en Arte la Sra. Lorna Rivera Mercado, directora del mismo, indicó que "…el menor fue matriculado desde los dos años en el cuido. Expreso que en relación con el menor podía informar que este tenía problemas del habla y rezago en aprendizaje. No obstante, era un niño muy alegre, siempre llegaba con higiene y vestimenta adecuada, con sus tareas y nunca había observado indicadores de maltrato o negligencia hacia este. El menor nunca había llegado con golpes o marcas a la escuela. Expresó que tanto la Sra. Mora como los bisabuelos del menor siempre estaban al pendiente del niño. Describió que estos eran muy diligentes y responsables para cubrir todas las necesidades del niño y hacer gestiones por las dificultades presentadas por

el menor en el ámbito escolar. Mencionó que la Sra. Mora participaba de las actividades escolares del menor y siempre observo buen trato y apego entre ambos. Indicó que era la primera vez que el Dpto. de la Familia visitaba el cuido en relación con el menor."

21. Vigente la orden de protección contra la demandante, esta relocaliza su domicilio en la casa de su hermano y custodio del menor, esto ante el hecho de que la abuela del niño había salido de Puerto Rico, y porque el demandado ya conocía de su dirección. El Departamento de la Familia conocía de esta mudanza.

22. El 6 de julio de 2022 el demandado solicitó se fijaran relaciones paternofiliales indicando que la petición de orden de protección bajo la Ley 54 había sido declarada sin lugar. En la misma fecha solicitó la custodia de su hijo. Ese mismo día se refirió la causa a la atención de la Unidad de Trabajo Social para estudio y recomendaciones, además se solicit[ó] se diera nombre y cualificaciones del perito iba a contratar para el estudio interestatal.

23. A petición del demandado y tras reunirse con las partes, la Unidad de Trabajo Social informó que la partes habían acordado un plan de relaciones paternofiliales provisional. El mismo fue acogido mediante resolución del 12 de diciembre de 2022. La misma incluía videollamadas y un plan de relaciones paternofiliales en Navidad los días: 13 y 15 de diciembre de 2022. Del padre estar una semana adicional en Puerto Rico, se extenderían las visitas los días 20 y 22 de diciembre de 2022. El padre y el tío materno del menor acordarían, mediante llamadas telefónicas los lugares de encuentro y horario, los días señalados.

24. La demandante cumplió con todo el Plan de Servicios del Departamento de la Familia.

25. Las partes acordaron extrajudicialmente unas relaciones paternofiliales a raíz de que el demandado estaría en Puerto Rico el 17 y 19 de febrero de 2023. Realizadas dichas relaciones paternofiliales el demandado radicó querella 10440301 ante el Departamento de la Familia ante expresiones de que el menor alegadamente había indicado que su tío materno y su madre lo habían golpeado. El demandado indicó que la demandante le había aceptado la situación y justificó la acción porque el menor había roto la computadora tipo laptop y celular de su hermana. Indicó que el menor tenía marcas físicas que mostraban la agresión. La demandada negó lo alegado y manifestó que esa era una represalia del demandado al ella negarse a retomar la relación de ambos. El Departamento de la Familia radicó informe el 24 de febrero de 2023 en el que manifestaron que "...la situación referida (según la moción sometida) a la línea de maltrato bajo el número 10440301, no cumplía con los requisitos de maltrato por lo cual no llegó a nuestras oficinas como un referido de recurrencia." Indicaron además que en todas las visitas realizadas el menor, algunas de ellas cercanas a las fechas en que el

demandado había compartido con el menor, específicamente el 13 y 22 de febrero de 2023. Manifestaron que, "...Nunca se observaron o encontraron indicadores de maltrato físico durante las visitas hacia el menor por parte del Sr. Del Valle ni de la Sra. Martínez durante el manejo del caso. Cabe destacar, que durante las visitas el menor se observaba en la mayoría de las ocasiones utilizando pantalones cortos y camisillas, lo que permitía visibilidad corporal del menor" Se manifiesta que el menor se veía bien cuidado, libre de golpes, con una relación óptima y afectiva con su madre y su tío materno, y que la demandante había cumplido a cabalidad con todo el plan de servicios. En visita realizada el 23 de febrero la menor AM mostró los equipos electrónicos (celular y laptop) que supuestamente ocasionaron que se golpeara al menor por haberlos roto y los mismos estaban en buen estado, la menor negó que hubiera ocurrido ninguna situación con estos equipos y con su hermano. No surge se haya validado las alegaciones de maltrato.

26. El 13 de marzo de 2023 se radicó informe interestatal.

27. El 16 de marzo de 2023 el demandado radicó moción alegando se estaba incumpliendo con las relaciones paternofiliales por videollamadas, la demandante aceptó que ante diferencias habían tenido al él insistir que regresaran no había contestado las llamadas, pero consultado con la trabajadora social las mismas habían sido retomadas. El Tribunal ordenó a las partes que videollamadas no podían usarse para interacción entre ellos y se debía limitar a relación del padre y el menor.

28. El 30 de marzo de 2023 la Trabajadora Social del Tribunal radicó moción en la que entre otros asuntos informó que el demandado en entrevista telefónica con ella le manifestó que realizó un nuevo referido a la línea de maltrato del Departamento de la Familia el 18 de marzo de 2023 (#10445145). La Trabajadora Social indicó que contactaría al Departamento de la Familia e informaría, lo que finalmente hizo en el Informe Social. Del mismo surge en cuanto a este incidente que el padre manifiesta que al realizarse una videollamada con el menor observó en el rostro del niño una mancha, la cual describió como una mancha de sangre en la mejilla. La Trabajadora Social del Departamento de la Familia, TS Ariana García, recibió un referido en el caso porque el menor [JMD] tenía un golpe, y decidió entrevistar nuevamente a la menor [AM], pero al llegar a la casa el 20 de marzo de 2023, no había nadie. Logró comunicación con la demandante quien le indicó estaba en Estados Unidos resolviendo situación de emergencia con una propiedad y que el niño se había caído. Observó al menor con un golpe en la cara. Le solicitó a la demandante que llevara al niño a recibir evaluación médica. La demandante decidió regresar a Puerto Rico y evaluaron al menor en el CDT de Las Piedras, donde descartaron que el golpe se haya producido por maltrato.

29. El 22 de mayo de 2023 se radicó informe social forense donde se recomendó que el demandado ostentara la custodia del menor y que se permitiera la relocalización de este.

30. De la evaluación psiquiátrica hecha a ambas partes se indica que ambos están emocionalmente capacitados para ejercer la custodia del menor. Ninguna de las partes tiene diagnóstico psiquiátrico a la fecha del informe.

31. Del Informe Social surge que la menor AM se retractó de la alegación que había realizado de que su madre la había maltratado a ella y su hermano. La menor manifestó que hizo esas alegaciones por presión de su hermana y por enojo con su madre al enterarse que le había escondido que su padre se había suicidado. Esa retractación también la había hecho ante la Trabajadora Social del Departamento de la Familia. En la evaluación psicológica y entrevista con la Trabajadora Social del Tribunal, la menor no relató ninguna situación con su madre, aunque sí reafirmó lo que antes había indicado sobre su padrastro. La Trabajadora Social del Departamento de la Familia entiende esta retractación se dio al ver las consecuencias de su acusación y que la menor había sido honesta desde un principio. Del mismo informe surge en entrevista con Ashley Mora Martínez, la hija de la demandante, que ella se decidió a presentar la querella al Departamento de la Familia por las quejas de su hermana en las que esta indicaba que su madre le delegaba el cuido del niño para mantenerse ella en el celular. Indicó que esa misma conducta la observó cuando vivió con ella. Alegó que quien vio a la demandante agarrar por el cuello al niño fue su pareja, no ella. No surge que se haya entrevistado a esta persona.

32. Del informe social surge que la señora Elaine Giraldi manifestó que ambas partes discutían cuando estaban juntos, que la demandante no atendía al menor y mandaba al demandado a hacerlo y que este mandaba a la menor AM a cuidar del niño. Informó que observó a la demandante gritarle al niño y pegarle. También observó al demandado pegarle al niño en el área del pañal. En la entrevista con la Trabajadora Social, la señora Giraldi negó haber estado en tratamiento de salud mental, más sin embargo en la evaluación psicológica admitió haber tenido un intento de suicidio y haber estado ingresada en hospital psiquiátrico.

33. La parte demandante indicó impugnaría el informe.

34. El demandado solicitó se le diera custodia provisional del menor antes de realizar el proceso de impugnación el 8 de junio de 2023 (Entrada 104 SUMAC). Radicó moción el 20 de junio de 2023 donde alegó que en febrero de 2023 el niño le había relatado que su tío paterno le había golpeado y que el informe del Departamento de la Familia había sido deficiente. Celebrada vista se ordenó que el menor no saliera de Puerto Rico y se suspendieron relaciones con el tío paterno hasta que se celebrara la vista de impugnación.

Se establecieron además relaciones paternofiliales provisionales. Todo esto quedó recogido en Resolución del 11 de julio de 2023. Las partes llegaron a acuerdos extrajudiciales para hacer cambios en fechas que fueron aceptados.

35. El 14 de agosto de 2023 el demandado presentó moción por derecho propio (Entrada 124 de SUMAC) en la que relataba varios incidentes que alegadamente había visto cuando el menor estaba bajo su cuidado en relaciones paternofiliales. El demandado informó además que radicó el caso HUL2462023-00512 de orden de protección de menores, ante sus sospechas de que el menor estaba siendo golpeado por su madre, su tío materno y su hermana AM, y que ellos habían cometido actos lascivos contra el menor. El demandado alegó en su moción que temía por la seguridad del menor debido a que "[l]a mama ya tiene un historial probado por la corte de haber agredido al niño anteriormente. La madre tiene historial de desórdenes psiquiátricos." El 15 de agosto de 2023 se presentó moción en similares términos por la abogada del demandado. En esa misma fecha la parte demandante presentó moción para que este Tribunal atendiera la petición de orden de protección radicada. Se refirió de manera urgente la situación a la Unidad de Trabajo Social. La Unidad de Trabajo Social informó que el demandado había radicado además querella ante la policía y dos querellas ante el Departamento de la Familia, querellas 10468957 y 10445145. La Unidad de Trabajo Social procede a realizar un nuevo referido, el 104705616 ante las alegaciones del demandado. La peticionada negó todo lo alegado. El Departamento de la Familia determinó referir el caso al programa CIMVAS para verificar situación, no removió al menor al no encontrar elementos de peligrosidad.

36. El Tribunal determinó ante intervención del Departamento de la Familia convertir la vista que estaba citada en una de estado de los procedimientos y no de impugnación. Celebrada la vista surge que el Departamento de la Familia había entrevistado al menor, que el menor hizo manifestaciones referentes a maltrato o actos lascivos y que el niño hablaba de manera confusa, es bien inquieto, se entretiene fácilmente y cambia de tema. El menor no mostró conducta sexualizada, ni hizo expresiones sobre maltrato o sobre abuso sexual. Surge además que alegadamente el demandado había utilizado palabras y preguntas dirigidas al hablar con el menor sobre los supuestos incidentes. Se dictó resolución otorgando otras fechas para las relaciones paternofiliales. Se ordenó a la Unidad de Trabajo Social informar si requería de realizar alguna nueva investigación en el caso o realizar algún cambio a sus recomendaciones. La Trabajadora Social solicitó se permitiera al Departamento de la Familia que finalizara el referido a CIMVAS antes de informar.

37. El Tribunal refirió la causa a la atención de la Unidad de Trabajo Social para que actualizara la investigación y se realice investigación e informe

complementario en la que se atiendan las alegaciones del demandante de abuso sexual y las alegaciones de la demandada de alienación parental.

38. Las partes estipularon un nuevo plan de relaciones paternofiliales en marzo del 2024.

39. El 6 de mayo de 2024 se radicó informe pericial del Programa CIMVAS en la que se concluye no se validaron las alegaciones de abuso sexual. Se recomendó que las partes se beneficiaran de terapia para manejar comunicación; que el menor se beneficiara de terapia psicológica y psicoeducativa preventiva; y, que se podía considerar evaluación enfocada en la enajenación parental. Surge de este informe que la Trabajadora Social, Herrero informó que el padre grabó mientras le hacía las preguntas al menor, que el niño realizaba gemidos en el video y que el padre utilizó algunas preguntas sugestivas durante la grabación. El Tribunal ordenó a la Trabajadora Social que tomara conocimiento del informe y presentara a su vez el suyo.

40. El 12 de junio de 2021 [sic] se presentó informe complementario por la Unidad de Trabajo Social. Del mismo surgen evaluaciones psiquiátricas y psicológicas al menor y las partes.

41. En cuanto al menor el informe psiquiátrico establece se indica que el niño luce algo hiperactivo y se recomienda evaluación psicológica. No surge ninguna conclusión sobre la existencia o no de enajenación parental. De la evaluación psicológica del menor[,] realizada cuando este tenía cuatro años[,] surge que el niño indicó que "... reside con su mamá y papá. En relación a las capacidades protectoras con las que cuentan sus progenitores refirió que ambos son buenos. No obstante, relación a su mamá refirió que le había pegado en la cara y que se sintió triste. Por otra parte, refirió que su papá (Jay) le dijo lo que tenía que decir." No surge de esa evaluación que se haya indagado el que el menor indica que vive con ambos padres, aunque la realidad es que hacía más de dos años que esto no era así. Tampoco surge información para aclarar las afirmaciones del menor de que la mamá lo había golpeado y de que su papá le había dicho lo que tenía que decir. El menor también indicó que quería vivir con su papá. Negó haber sido víctima de abuso sexual.

42. Del informe psicológico a la demandante surge que puede ejercer el rol custodio. Del informe psiquiátrico a ella se concluye que esta "Capacitada emocionalmente." Y se le recomendó terapia psicológica para trabajar traumas.

43. Del informe psicológico al demandado no se hizo ninguna recomendación de si estaba o no capacitado para ejercer rol custodio, lo que se indica es que "... [a] través del proceso de la entrevista podemos observar el deseo de ostentar la custodia de su hijo [JMD]. escuchó referirse afectivamente en torno a su hijo. No obstante, el evaluado requiere servicios para fortalecer áreas de necesidad. Ante lo discutido se recomienda lo siguiente:

1. Asistencia psicológica al Sr. Jay D. Dávila con la finalidad de promover la expresión de pensamientos y sentimientos asociados a las experiencias vividas: manejo de emociones (asociadas conflicto legal y parental), solución de conflictos, estrategias para lograr comunicarse efectivamente en el mejor interés del menor; manejo de coraje." En el informe psiquiátrico se recomienda "...custodia a papá en base a la conducta enajenante de mamá." Del informe no surge ninguna referencia a la alegada conducta enajenante de esta, más allá de que el entrevistado narra que mamá es maltratante. Esta recomendación no es consistente con la recomendación que el mismo psiquiatra realizó a la demandante y que se encuentra resumida en el inciso anterior.

44. La Trabajadora Social asignada indicó en su informe complementario que recomendaba que "la custodia del menor [JMD] sea otorgada al padre, Sr. Jay Dee Dávila y que se autorizara el traslado del menor a Filadelfia, Pensilvania." En discusión del caso con el psiquiatra y la Trabajadora Social este informó que: "1. Inicialmente se recomendó custodia para papá por negligencia de mamá. 2. No encontramos indicadores de alienación parental por parte de papá." No surge discusión del caso con la psicóloga. La Trabajadora Social afirmó que no se había probado que el menor estuviera alineado con ninguno de los padres.

45. El padre ha cumplido con relaciones paternofiliales fijadas de manera regular, la única dificultad que se presentó en un momento dado fue con las videollamadas ante el corto lapso de atención que mostraba el niño. Las partes llegaron a mejorar su comunicación y establecieron un plan de relaciones filiales más abierto.

Aún insatisfecho con la determinación del foro primario, el 25 de julio de 2025, el señor Dávila presentó el recurso de epígrafe en el que formuló los siguientes señalamientos de error:

ERRÓ EL TPI AL NO INCLUIR DETERMINACIONES DE HECHOS PROBADOS EN EL CASO Y NO HIZO CONCLUSIONES EN DERECHO PARA APOYAR SU DICTAMEN PARA CONCEDER LA CUSTODIA MONOPARENTAL EN CLARA CONTRAVENCIÓN A LA REGLA 42.2 DE PROCEDIMIENTO CIVIL

ERRÓ EL TPI AL EMITIR UNA RESOLUCIÓN OTORGANDO LA CUSTODIA DEL MENOR A LA MADRE, SIN TOMAR EN CONSIDERACIÓN LOS CRITERIOS ESTABLECIDOS PARA LA ADJUDICACIÓN DE CUSTODIA Y EL MEJOR BIENESTAR DEL MENOR BAJO LA LEY NÚM. 223 DE 21 DE NOVIEMBRE DE 2011, ART. 7

ERRÓ EL TRIBUNAL DE PRIMERA INSTANCIA AL DECLARAR LA CUSTODIA DEL MENOR JDM A FAVOR DE LA MADRE, YA QUE EL MEJOR BIENESTAR DEL

MENOR NO ESTÁ GARANTIZADO CON LA DEMANDANTE-APELADA

En la misma fecha, el apelante presentó su *Alegato Suplementario al Recurso de Apelación.*

En atención a nuestra *Resolución,* y luego de varios trámites procesales, el 20 de octubre de 2025, la señora Martínez presentó su *Alegato en Oposición.*

Con el beneficio de la comparecencia de las partes, procedemos a resolver.

## II.

## A.

Es norma conocida que, ante la ausencia de error manifiesto, prejuicio, parcialidad o pasión, los tribunales apelativos no deben intervenir para revisar la apreciación de la prueba, la adjudicación de credibilidad o las determinaciones de hechos formuladas por el foro primario. Regla 42.2 de Procedimiento Civil, *supra; Peña Rivera v. Pacheco Caraballo,* 213 DPR 1009, 1024 (2024); *Ortíz Ortíz v. Medtronic,* 209 DPR 759, 778 (2022); *Santiago Ortiz v. Real Legacy et al.,* 206 DPR 194, 219 (2021).

Ello, toda vez que el juzgador de los hechos en dicha etapa evalúa la prueba de primera mano, colocándose en una posición privilegiada frente a los tribunales revisores para aquilatarla adecuadamente. *Gallardo v. Petiton,* 132 DPR 39, 56 (1992). En vista de que se presume la corrección de los dictámenes del foro inferior, la intervención apelativa solo procede cuando se demuestra que el tribunal recurrido incurrió en error manifiesto, pasión, prejuicio o parcialidad. *Hernández Maldonado v. Taco Maker,* 181 DPR 281, 289 (2011). Reiteradamente se ha reconocido que el tribunal sentenciador se encuentra en mejor posición para evaluar la prueba testifical, ya que tiene la oportunidad de oír, ver y apreciar el comportamiento del testigo. *Peña Rivera v. Pacheco Caraballo, supra,* pág. 1025.

Por tal razón, en asuntos de derecho de familia, los tribunales apelativos reconocen una norma de amplia deferencia hacia las determinaciones del foro primario, concediéndole un margen considerable de discreción. *Ortiz v. Vega*, 107 DPR 831, 832 (1978). No obstante, dicha deferencia no es absoluta y cede cuando la parte promovente logra demostrar que:

> [h]ubo un craso abuso de discreción, o que el tribunal actuó con prejuicio y parcialidad, o que se equivocó en la interpretación o aplicación de cualquier norma procesal o de derecho sustantivo, y que nuestra intervención en esa etapa evitará un perjuicio sustancial. *Lluch v. España Service Sta.*, 117 DPR 729, 745 (1986).

De esta forma, la norma de deferencia pierde vigencia cuando, al analizar la totalidad de la evidencia presentada, el foro revisor concluye que las determinaciones del tribunal de instancia resultan incompatibles con el balance más racional, justo y jurídico de toda la prueba recibida. *Sucn. Rosado v. Acevedo Marrero*, 196 DPR 884, 917-918 (2016); *Dávila Nieves v. Meléndez Marín*, 187 DPR 750, 771 (2013); *Rivera Menéndez v. Action Services*, 185 DPR 431, 444 (2012).

Asimismo, la deferencia no se extiende a la evaluación de la prueba pericial y documental. *González Hernández v. González Hernández*, 181 DPR 746, 777 (2011). En estos casos, los tribunales apelativos nos encontramos en igual posición que el tribunal sentenciador para apreciar dicha prueba y adoptar nuestro propio criterio en cuanto a las determinaciones de hecho que de ella se desprendan. *Íd.*; *Arrieta v. De La Vega*, 165 DPR 538, 551 (2005). Incluso, aun cuando la prueba pericial resulte técnicamente correcta, el tribunal puede descartarla. *González Hernández v. González Hernández, supra.*

Por otro lado, es preciso destacar que las determinaciones de hechos y conclusiones de derecho del tribunal constituyen los fundamentos sobre los cuales el tribunal de instancia sostiene la

decisión que emite en un caso. *Cárdenas Maxán v. Rodríguez,* 119 DPR 642, 656 (1987). Estas no solo sirven para justificar el dictamen ante las partes, sino que representan el mecanismo mediante el cual el foro primario demuestra que atendió de forma adecuada todas las controversias planteadas y permite que las partes y el foro apelativo conozcan con claridad cual fue la base de la decisión. *Firpi v. Pan American World Airways, Inc.,* 89 DPR 197, 218-219 (1963). Por ello, es necesario que el tribunal de primera instancia exponga los fundamentos de su determinación para que los foros apelativos puedan ejercer adecuadamente su función revisora. *Torres García v. Dávila Díaz y otros,* 140 DPR 83, 86 (1996).

**B.**

La patria potestad se define como el conjunto de deberes y derechos que corresponden a los progenitores sobre la persona y los bienes de los hijos, desde que estos nacen hasta que alcanzan la mayoría de edad u obtienen su emancipación. Art. 589 del Código Civil, 31 LPRA sec. 7241. A su vez, la custodia constituye una manifestación de la patria potestad, en tanto impone a los padres el deber primario de mantener a sus hijos no emancipados bajo su cuidado y compañía. *Jusino González v. Norat Santiago,* 211 DPR 855, 863 (2023); *Torres, Ex parte,* 118 DPR 469, 476 (1987). En ese sentido, la custodia se refiere a la tenencia o control físico que ejerce un progenitor sobre sus hijos. *Torres, Ex parte, supra,* pág. 477.

En particular, la custodia compartida es la obligación de ambos progenitores de ejercer directa y totalmente todos los deberes y funciones que conlleva la patria potestad de los hijos, relacionándose el mayor tiempo posible y brindándoles la compañía y atención que se espera del progenitor responsable. Art. 602 del Código Civil, 31 LPRA sec. 7281; Art. 3 de la Ley Núm. 223-2011, 32 LPRA sec. 3181. De otra parte, la custodia exclusiva se refiere a cuando esta se asigna a un solo progenitor. *Jusino González v. Norat*

*Santiago, supra,* pág. 864. A tales efectos, el Código Civil dispone que la custodia del hijo, acompañada o no del ejercicio exclusivo de la patria potestad, puede asignarse a un solo progenitor: (a) mientras se ventila el proceso de divorcio o de nulidad del matrimonio; (b) luego de decretada la disolución o anulado el matrimonio; o (c) cuando hay diferencias irreconciliables o reiteradas entre los progenitores que afectan significativamente la crianza razonada, responsable y efectiva del hijo. Art. 606 del Código Civil, 31 LPRA sec. 7281. En estos supuestos, no puede impedirse ni entorpecerse el contacto del otro progenitor con su hijo, aunque sí puede regularse conforme a los dispuesto en el Código. *Íd.*

Al adjudicar la custodia, los tribunales deben utilizar como criterio rector el bienestar y los mejores intereses del menor. *Jusino González v. Norat Santiago, supra; Muñoz Sánchez v. Báez De Jesús,* 195 DPR 645, 651 (2016). Esto implica que la decisión judicial sobre custodia debe alcanzarse tras un análisis objetivo, ponderado y cuidadoso de todas las circunstancias del caso, teniendo como norte principal el bienestar del menor. *Jusino González v. Norat Santiago, supra; Ortiz v. Meléndez,* 164 DPR 16, 26-27 (2005).

El Tribunal Supremo de Puerto Rico ha reconocido que, en virtud de las prerrogativas que emanan del poder de *parens patriae* del Estado, los tribunales poseen amplias facultades para adoptar las medidas que estimen necesarias al adjudicar la custodia de un menor. *Jusino González v. Norat Santiago, supra,* pág. 865. De igual forma, los tribunales deben guiarse principalmente por el bienestar y los mejores intereses del menor ya que éstos constituyen la base de la política pública en esta materia. *Pena v. Pena,* 164 DPR 949, 958-959 (2005); *Marrero Reyes v. García Ramírez,* 105 DPR 90, 104 (1976).

La Ley Núm. 223-2011, según enmendada, conocida como la *Ley Protectora de los Derechos de los Menores en el Proceso de*

*Adjudicación de Custodia* (en adelante, Ley Núm. 223-2011)*,* 32 LPRA secs. 3181 *et seq.*, persigue, entre otros objetivos, fomentar un mayor grado de participación y presencia de ambos progenitores en la vida de los menores que son producto de parejas divorciadas o separadas, con el fin de propiciar una mejor calidad de vida. Exposición de Motivos de la Ley Núm. 223-2011. En consonancia con ello, dicha ley establece como política pública la promoción de la custodia y patria potestad compartida, para facilitar la continuidad y el fortalecimiento de los vínculos afectivos propios de una relación materno o paterno filial adecuada. *Torres, Ex parte*, *supra*, págs. 505-506.

Asimismo, en cuanto a los criterios que deben considerarse en toda determinación de custodia, el Artículo 7 de la Ley Núm. 223-2011, 32 LPRA sec. 3185, dispone que "al considerarse una solicitud de custodia en la que surjan controversias entre los progenitores en cuanto a la misma, el tribunal referirá el caso al trabajador social de Relaciones de Familia, quien realizará una evaluación y rendirá un informe con recomendaciones al tribunal." De esta manera, los foros judiciales cuentan con el apoyo de la Unidad Social de Relaciones de Familia y Asuntos de Menores, cuya función principal es ofrecer asesoramiento social mediante evaluaciones periciales que permitan al tribunal tomar decisiones informadas en los casos ante su consideración. *Jusino González v. Norat Santiago*, *supra*, pág. 865; *Muñoz Sánchez v. Báez de Jesús*, *supra*, pág. 652.

Añade el referido artículo que tanto el trabajador social, al efectuar su evaluación, como el tribunal, al emitir su determinación, deberán considerar varios criterios, tales como:

> 1) La salud mental de ambos progenitores, así como la del hijo(a) o hijos(as) cuya custodia se va a adjudicar.
>
> 2) El nivel de responsabilidad o integridad moral exhibido por cada uno de los progenitores y si ha habido un historial de violencia doméstica entre los integrantes del núcleo familiar.

3) La capacidad de cada progenitor para satisfacer las necesidades afectivas, económicas y morales del menor, tanto presentes como futuras.

4) El historial de cada progenitor en la relación con sus hijos, tanto antes del divorcio, separación o disolución de la relación consensual, como después del mismo.

5) Las necesidades específicas de cada uno de los menores cuya custodia está en controversia.

6) La interrelación de cada menor, con sus progenitores, sus hermanos y demás miembros de la familia.

7) Que la decisión no sea producto de la irreflexión o coacción.

8) Si los progenitores poseen la capacidad, disponibilidad y firme propósito de asumir la responsabilidad de criar los hijos conjuntamente.

9) Los verdaderos motivos y objetivos por los cuales los progenitores han solicitado la patria potestad y custodia compartida.

10) Si la profesión, ocupación u oficio que realizan los progenitores impedirá que funcione el acuerdo efectivamente.

11) Si la ubicación y distancia de ambos hogares perjudica la educación del menor.

12) La comunicación que existe entre los progenitores y la capacidad para comunicarse mediante comunicación directa o utilizando mecanismos alternos.

(13) Analizará la presencia de la enajenación parental, o cualesquiera otras razones que pudieran ocasionar la resistencia del menor para relacionarse con sus padres. [...]

(13) [sic] Cualquier otro criterio válido o pertinente que pueda considerarse para garantizar el mejor bienestar del menor. Art. 7 de la Ley Núm. 223-2011, 32 LPRA sec. 3185.

De igual modo, el Artículo 604 del Código Civil, 31 LPRA sec. 7283, recoge criterios sustancialmente similares a los establecidos en el precitado Artículo 7 de la Ley Núm. 223-2011, *supra.*

Por otro lado, los profesionales que asisten al tribunal en la formulación de recomendaciones periciales para adjudicar la custodia se rigen por las *Normas y Procedimientos de las Unidades Sociales de Relaciones de Familia y Asuntos de Menores.* Ello responde a la necesidad de que el foro judicial cuente con la información más amplia y completa posible para resolver conforme al mejor bienestar del menor. *Jusino González v. Norat Santiago, supra,* págs. 865-866.

Así, cuando existe una controversia entre los progenitores en relación con las relaciones filiales de un menor, el tribunal referirá el caso a un trabajador social para que realice la evaluación correspondiente y rinda un informe con recomendaciones. Véanse, Normas VII y VIII en las *Normas y Procedimiento de las Unidades de Relaciones de Familia y Asuntos de Menores.* Como resultado de dicho proceso, el trabajador social emitirá un Informe Social Forense, definido como el producto final de la evaluación en el que se atiende la controversia referida por el Tribunal, se ofrecen recomendaciones sobre la controversia y se destacan todas las áreas evaluadas, la fuente de datos, e integra el conocimiento teórico o razonamiento que fundamenta las recomendaciones. Norma VI (Z) en las *Normas y Procedimientos de las Unidades Sociales de Relaciones de Familia y Asuntos de Menores.*

En lo relativo a las recomendaciones del trabajador social sobre las relaciones filiales, este identificará los factores que inciden en el plan y sugerirá la asistencia que requiera la familia para superar sus limitaciones. Véase, Norma VII (P) en las *Normas y Procedimiento de las Unidades de Relaciones de familia y Asuntos de Menores.*

A su vez, el Artículo 8 de la Ley núm. 223-2011, 32 LPRA sec. 3186, establece que tanto las recomendaciones del trabajador social como la determinación judicial sobre custodia deben estar dirigidas a garantizar el mejor bienestar del menor. No obstante, dichas recomendaciones constituyen solo uno de los factores que el tribunal debe considerar al emitir su determinación, la cual deberá adoptarse a la luz de todas las circunstancias del caso y en estricto cumplimiento con la política pública de protección al menor. *Íd.*

La determinación de cuáles son los mejores intereses del menor está enmarcada en el derecho que este tiene a una correcta formación física, moral y espiritual. *Ortiz v. Meléndez, supra,* pág.

27; *Nudelman v. Ferrer Bolívar,* 107 DPR 495, 509 (1978). Para ello, resulta necesario evaluar factores tales como: la preferencia del menor, su sexo, edad y salud mental y física; el cariño que puede brindársele por las partes en controversia; la habilidad de las partes para satisfacer debidamente las necesidades afectivas, morales y económicas del menor; el grado de ajuste del menor al hogar, la escuela y la comunidad en que vive; la interrelación del menor con las partes, sus hermanos y otros miembros de la familia; y la salud psíquica de todas las partes. *Muñoz Sánchez v. Báez de Jesús, supra,* pág. 651; *Ortíz v. Meléndez, supra,* pág. 27; *Marrero Reyes v. García Ramírez, supra,* pág. 105.

Finalmente, la Ley Núm. 102-2018, conocida como Ley de la "Guía Uniforme para Casos de Relocalización del Padre Custodio", 32 LPRA secs. 3371 *et seq.,* persigue salvaguardar el principio rector del mejor bienestar del menor. En particular, el Artículo 6 de la Ley Núm. 102-2018, 32 LPRA sec. 3376, enumera los factores a considerar para salvaguardar el mejor bienestar del menor, a saber:

1. Preferencia del menor en aquellos casos donde tenga derecho a ser oído;

2. Relación del menor con el padre no custodio;

3. Relación del menor con las personas interesadas y la forma en que éstos llevan a cabo su derecho de visita;

4. Periodo de tiempo que el menor lleva residiendo en la residencia principal y los lazos emocionales que lo une a ella;

5. Oportunidades de desarrollo, tanto emocional, como físico y educacional;

6. Impacto que tendrá el traslado en su desarrollo;

7. Disposición del padre custodio o tutor de permitir al otro padre no custodio o persona interesada de ejercer su derecho a visita, relacionarse con el menor y custodia compartida en los casos que aplique;

8. Potencial de cambio en la vida del padre custodio o tutor y del menor;

9. Posibilidad económica del padre no custodio o persona interesada de ejercer su derecho a visita para relacionarse con el menor;

10. Grado de responsabilidad del padre no custodio o persona interesada en sus obligaciones para con el menor;

11. El Tribunal podrá ordenar el realizar un estudio social del área al cual planean mudar al menor. Este estudio, entre otras cosas, deberá incluir un análisis de la criminalidad del área interesada;

12. Lugar donde el menor va a estudiar, nombre e información completa de la escuela: dirección, teléfono, maestro del menor y nombre del director;

13. En caso de que el menor no tenga edad suficiente para asistir a la escuela, nombre del cuido e información completa en el que estará el menor o en caso de que sea una persona particular información completa de la misma;

14. Lugar de trabajo, nombre e información general del padre custodio o tutor legal: teléfono, dirección y nombre del patrono;

15. Información de las personas adicionales al padre custodio o tutor legal con las que vivirá el menor, de ser el caso;

16. Información del casero en los casos donde la residencia sea alquilada;

17. Certificación de empleo o estudios;

18. Se observará la recomendación del trabajador social en cuanto al efecto que esto tendrá en el menor;

19. El seguro médico que tendrá el menor; y

20. Cualquier otro factor que el juzgador entienda necesario, tomando como principio la equidad entre las partes.

A su vez, el citado artículo establece que se permitirá la relocalización del menor si se prueba que: (1) no es para impedir la relación del padre no custodio o persona interesada con el menor; (2) existe una razón válida y determinante para relocalizarse y (3) ofrecerá una mejor oportunidad de vida tanto para el padre custodio o tutor como para el menor. *Íd.*

**III.**

En el recurso ante nos, el apelante plantea, en síntesis, que el TPI erró: (1) al conceder la custodia del menor a la madre sin emitir determinaciones de hechos ni conclusiones de derecho que fundamentaran su dictamen, en contravención a la Regla 42.2 de Procedimiento Civil, *supra*; (2) al no tomar en consideración ni analizar los criterios establecidos en la Ley Núm. 223-2011, *supra*,

para la adjudicación de custodia y el mejor bienestar del menor; y (3) al declarar la custodia del menor a favor de la madre, ya que el mejor bienestar del menor no está garantizado bajo dicha determinación. Por su parte, la apelada sostiene que el foro primario ejerció correctamente su discreción judicial tras la celebración de múltiples vistas de impugnación y la evaluación de la prueba pericial y testifical presentada.

Examinado el expediente en su totalidad, coincidimos con el apelante en cuanto a que la *Resolución* apelada no cumple con las exigencias de la Regla 42.2 de Procedimiento Civil en cuanto a la formulación de determinaciones de hechos y conclusiones de derecho que permitan una adecuada revisión del dictamen. Si bien el TPI notificó posteriormente una *Resolución* en la que incluyó un tracto procesal y "determinaciones de hechos", del dictamen apelado y del expediente no se desprende cómo el foro primario llegó a la conclusión de apartarse de las recomendaciones periciales rendidas por la TS Herrero. Más aún, el foro primario no identificó qué prueba testifical específica, qué evaluación pericial o qué aspecto surgido de las vistas de impugnación sustentó su determinación de no acoger dicha recomendación, a pesar de tratarse del resultado de una investigación social exhaustiva realizada por la propia trabajadora social del Tribunal. De este modo, el señalamiento del apelante no se limita a un defecto meramente formal y demuestra que no se explicó por qué se optó por esa determinación que se aparta de lo recomendado por la TS Herrero.

A pesar de la norma general de deferencia a las determinaciones de los foros primarios que señalamos anteriormente, en este caso dicha deferencia debe ceder, toda vez que la *Resolución* apelada no articula las razones que permitan examinar la corrección del ejercicio de discreción judicial.

A la luz de lo anterior, procede examinar si, conforme al expediente ante nuestra consideración y a los criterios establecidos en la Ley Núm. 223-2011, *supra,* la determinación de custodia adoptada por el foro primario cuenta con apoyo suficiente en la prueba presentada y si, en efecto, responde al mejor bienestar del menor, particularmente cuando el Tribunal decidió apartarse de las recomendaciones periciales emitidas por la TS Herrero.

Conforme al Artículo 7 de la Ley Núm. 223-2011, 32 LPRA sec. 3185, la adjudicación de custodia debe responder al mejor bienestar del menor tras una evaluación ponderada de las circunstancias particulares del caso, incluyendo, entre otros factores, la salud mental de los progenitores, su capacidad para atender las necesidades emocionales y afectivas del menor, la estabilidad del entorno propuesto, el historial de cada progenitor en la relación con sus hijos, la ausencia de conductas que expongan al menor a dinámicas de conflicto entre los progenitores, así como la evaluación de la posible presencia de indicadores de enajenación parental que pudieran afectar su relación con alguno de ellos.

Del expediente surge que ambos progenitores fueron evaluados desde el punto de vista psicológico y psiquiátrico y que ninguno presenta condiciones que, por sí solas, los incapaciten para ejercer funciones parentales. Asimismo, las múltiples alegaciones relacionadas con posible maltrato o abuso fueron objeto de investigación por parte del Departamento de la Familia y del Programa CIMVAS, sin que dichas evaluaciones validaran la existencia de abuso sexual ni identificaran indicadores clínicos que justificaran un cambio de custodia sobre ese fundamento.

En cuanto a las alegaciones de alienación parental, el *Informe Social Complementario* refleja que estas fueron atendidas de forma expresa y discutidas con el psiquiatra del Tribunal, el Dr. Serafín Orengo Vega, quien concluyó que no se identificaron indicadores de

alienación parental por parte del padre. A su vez, la TS Herrero afirmó que no se había probado que el menor estuviera alineado con alguno de los progenitores de forma indebida.

En este contexto, las recomendaciones emitidas por la TS Herrero integraron los criterios estatutarios aplicables, al considerar la estabilidad emocional y mental de los progenitores, la capacidad de cada uno para atender las necesidades afectivas y de desarrollo del menor, la dinámica observada en el núcleo familiar y la ausencia de indicadores válidos de abuso sexual o de enajenación parental. Dicho análisis se apoyó en evaluaciones periciales, informes interagenciales y observaciones directas, sin que del proceso de impugnación surgiera prueba sustantiva que desvirtuara esas conclusiones.

A partir de esa evaluación, la TS Herrero rindió un *Informe Social Forense* y, posteriormente, un *Informe Social Complementario*, en los cuales recomendó de manera consistente que la custodia del menor fuera concedida al padre y que se autorizara su relocalización, al concluir que dicha alternativa redundaba en el mejor bienestar del menor. Estas recomendaciones no fueron preliminares ni condicionadas. Por el contrario, se mantuvieron aun luego de atender expresamente las alegaciones de abuso sexual formuladas por el padre y las alegaciones de alienación parental planteadas por la madre. A pesar de ello, el foro primario decidió no acoger dichas recomendaciones.

Según el testimonio de la TS Herrero durante la vista de impugnación de informe, luego de un extenso proceso de estudio social —que incluyó entrevistas con las partes, colaterales y profesionales, así como la evaluación del historial de cada progenitor en su relación de pareja y su participación en el proceso de desarrollo y crianza del menor antes, durante y después de la separación— concluyó que el señor Dávila era el progenitor que

contaba con la mayor capacidad para asumir la custodia del menor y velar por su bienestar.[51] En particular, la TS Herrero explicó que, tras analizar la información recopilada en su investigación social, concluyó que "el progenitor que posee la mejor capacidad y firme propósito de cuidar y velar por el bienestar del menor era el señor Jay Dávila".[52]

En cuanto a los fundamentos de su recomendación, la TS Herrero indicó que dentro de su análisis consideró el entorno familiar y social del menor, así como el concepto de capital social, el cual describió como la capacidad de un progenitor de brindarle al menor oportunidades de desarrollo físico, emocional y educativo.[53] Según indicó, al aplicar ese análisis al caso en particular, concluyó que, el retorno del menor al entorno familiar previo en los Estados Unidos no representaría un cambio adverso significativo en su vida y que dicho contexto familiar y social sería beneficioso para su desarrollo, dado que allí el menor contaba con familiares tanto por la vía paterna como materna.[54]

De igual forma, al ser cuestionada sobre las alegaciones de alienación parental, la TS Herrero expresó que, conforme a la información recopilada durante el proceso evaluativo, no identificó elementos que permitieran validar la existencia de un patrón de alienación parental por parte de ninguno de los progenitores.[55]

Por otro lado, al examinar la prueba presentada durante las vistas de impugnación, no surge del expediente que se haya presentado evidencia pericial de peso suficiente como para desacreditar los hallazgos y conclusiones alcanzados por la TS Herrero. De las transcripciones de las vistas y del informe pericial

---

[51] Véase Transcripción de la Prueba Oral (TPO) de la vista celebrada el 6 de diciembre de 2024, págs. 12-13.

[52] TPO de la vista celebrada el 6 de diciembre de 2024, pág. 98, líneas 12-18.

[53] Véase TPO de la vista celebrada el 6 de diciembre de 2024, págs. 98 – 99.

[54] *Íd.*

[55] Véase TPO de la vista celebrada el 6 de diciembre de 2024, págs. 118 –124.

de impugnación se desprende que los cuestionamientos dirigidos al informe interagencial (*Estudio Social Pericial)* del TS Zamot, así como a los informes preparados por la TS Herrero, estuvieron enfocados principalmente en aspectos relacionados con la suficiencia de la información utilizada y la metodología empleada en el proceso evaluativo.

No obstante, del récord surge expresamente que el perito de impugnación, el TS Rivera, no realizó una investigación de campo independiente para contradecir los hallazgos contenidos en dichos informes. Por el contrario, de su informe consta que no realizó entrevistas ni llevo a cabo gestiones dirigidas a corroborar o refutar directamente la veracidad del contenido que sirvió de base a las recomendaciones impugnadas.[56]

Antes de exponer sus críticas específicas al informe social, el propio perito de impugnación, el TS Rivera, explicó que, su proceso de intervención pericial consistió en revisar los informes preparados en el caso desde dos perspectivas principales. Según declaró, su análisis se dividió, por un lado, en evaluar "la metodología, [...] [l]a forma y manera en cómo se realizó la evaluación" y, por otro, en examinar "el contenido de esos informes".[57]

En cuanto al informe interagencial preparado por el TS Zamot, Rivera señaló que, a su entender, dicho informe se limitaba principalmente a una evaluación de la vivienda y de las facilidades físicas del hogar propuesto para el menor, sin abordar otros aspectos del entorno social o comunitario, tales como información sobre la escuela, servicios médicos o características del área en la que residiría el menor. De igual forma, sostuvo que, el informe no

---

[56] Véase la *Evaluación y Análisis Pericial al Informe Social Forense sobre los asuntos de Custodia, Relaciones Filiales y Relocalización* en la Entrada Núm. 119 del caso Núm. HU2021RF00710 en el SUMAC del TPI, pág. 4. Véase, también, TPO de la vista de celebrada el 23 de enero de 2025, pág. 76, líneas 1-9.
[57] TPO de la vista celebrada el 23 de enero de 2025, pág. 87, líneas 15-25.

recogía entrevistas con terceros o vecinos que permitieran corroborar información sobre el entorno social del señor Dávila.[58]

Respecto a los informes preparados por la TS Herrero, Rivera expresó que, a su juicio, la trabajadora social "no tenía todos los elementos de juicio" al momento de emitir sus recomendaciones y que, según su apreciación, existía una "falta de información" en algunos aspectos del proceso investigativo.[59]

No obstante, reiteramos que del propio testimonio del TS Rivera se desprende que sus señalamientos estuvieron dirigidos principalmente a cuestionar la suficiencia de la información recopilada y la forma en que se estructuraron los informes evaluados. Así, aun al presentar sus críticas metodológicas, el perito de impugnación no refutó mediante una evaluación social independiente los hallazgos sustantivos contenidos en los informes rendidos en el caso.

A pesar de ello, el foro primario decidió apartarse de las recomendaciones de la TS Herrero sin explicar qué prueba concreta lo llevó a hacerlo. Del dictamen recurrido no surge qué testimonio específico, qué evaluación pericial ni qué aspecto discutido durante las vistas de impugnación fue determinante para adoptar una conclusión distinta. Tampoco se desprende cómo el TPI evaluó esa prueba a la luz de los criterios establecidos en la Ley Núm. 223-2011, *supra*, ni de qué manera concluyó que la custodia a favor de la madre respondía mejor al bienestar del menor.

Ante la ausencia de una explicación clara que permita entender por qué se descartaron las recomendaciones periciales existentes —incluyendo el análisis interagencial considerado por la propia trabajadora social del Tribunal— y ante la falta de evidencia sustantiva que las desvirtúe, concluimos que la determinación de

---

[58] Véase TPO de la vista celebrada el 23 de enero de 2025, pág. 91, líneas 21-25, págs. 92 – 129, pág. 135, líneas 14-24.
[59] TPO de la vista celebrada el 23 de enero de 2025, págs. 156 – 158.

custodia adoptada por el foro primario no encuentra apoyo suficiente en el expediente.

Por todo lo anterior, procedería revocar la *Resolución* recurrida y acoger las recomendaciones contenidas en el *Informe Social Forense* y en el *Informe Social Complementario,* en cuanto a conceder la custodia del menor al padre, por ser la alternativa que, conforme al expediente y al derecho aplicable, mejor protege su bienestar.

No obstante, considerando el tiempo transcurrido y en aras de salvaguardar el bienestar del menor, evitando posibles efectos adversos a su estabilidad, se le ordena a la TS Herrero que prepare en un término de **treinta (30) días** un informe social suplementario; el cual deberá ser discutido en una vista a ser celebrada dentro del término de **cinco (5) días**, contados a partir de la fecha en que se radique dicho informe.

**IV.**

Por los fundamentos antes expuestos, se devuelve el caso al TPI para que ordene la preparación de un informe social suplementario dentro del término de treinta (30) días y celebre una vista para su evaluación dentro de los cinco (5) días, siguientes a su presentación.

Nada de lo aquí expresado debe entenderse como que se ha dejado sin efecto la custodia actualmente ejercida por la parte apelada.

Notifíquese.

Lo acuerda el Tribunal, y lo certifica la Secretaria del Tribunal de Apelaciones.


Lcda. Lilia M. Oquendo Solís
Secretaria del Tribunal de Apelaciones